[Civ. No. 19255. First Dist., Div. One. Mar. 21, 1961.]

Estate of RAYMOND C. KELL, Deceased. ANITA MAE MASON, Respondent, v. RUTH C. KELL, Appellant.

Timothy A. O'Connor and Joseph R. Panetta for Appellant.

Bressani & Hansen for Respondent.

WOOD (Fred B.), J. pro. tem.*—A purported will of Raymond C. Kell, decedent, executed about September 10, 1957, was denied probate upon several grounds.

We will first consider whether or not there is substantial evidence in support of the trial court's finding that decedent was not of sound mind at the time of execution of the purported will.[1] Our examination of the record convinces us

---

*Assigned by Chairman of Judicial Council.

[1]The court below specifically found:

The decedent "was not of sound and/or disposing mind in that . . . [he] . . . had been, for a long period of time, prior to his death, and at the time when said document was executed, under the influence of alcoholic beverages to such a degree that he did not know what he was doing when he executed said document. . . .

"That it is true that the said Raymond C. Kell, for a long time prior to the time that he executed said document, was so addicted to the use of intoxicating liquors that he was suffering from mental derangement rendering it impossible for him to recognize those about him and in

that this question must be answered in the affirmative and the judgment affirmed.

The decedent operated the Uvas Dam Resort, consisting of a cafe, bar, swimming pool, picnic and camping grounds.

One Clark Heckendorn worked for him as life guard at the swimming pool during the last two and one-half years of decedent's life. He testified decedent was an alcoholic. The witness never saw him when he was not showing some influence of alcohol. He saw him almost every day during the last six months of his life. Most of the time he would be showing the effects of alcohol to the point that he would be staggering. During the last two months of his life he was usually drunk. Even before that he was an alcoholic. His face showed signs of it.

One day around September the witness had occasion to go into the bar with two Mexican gentlemen, Bud and Joe, and continued in the bar with them while they were there and left with them. Raymond Kell was there at that time. The witness was sitting right there with them all during that visit. Mr. Kell did not write anything during that visit. He presented a document[2] to the other two and asked them to sign it. They did sign it. Kell did not sign anything during any of that time. He bought the other two a beer and took the document with him.

At the very time this conversation was held Mr. Kell was awfully drunk. Asked to describe how Kell was acting, Heckendorn said, ''Well—Well, he wasn't able to control—well, like vibrating; I mean, shaking and stuff like that. He was—and—'' He was not able to stand perfectly erect. In walking he kind of weaved a little bit. When the three came in Kell had a glass of gin and after the other two signed he drank with them. When the three came in he was sitting down on the side next to the door and got up and poured himself a glass of gin. It was a water glass about three-fourths

particular Contestant Anita Mae Mason, who was his daughter and who was a natural object of his bounty, nor could he engage in business transactions nor did he have the capacity to make any testamentary disposition of his property; that said addiction to intoxicating liquors had continued for such a period of time that said Raymond C. Kell, during the last six months prior to his death was completely alcoholic and also at the time he signed and executed said document which is handwritten in form and alleged to be one document which together with another typewritten document on file herein as a Will, was propounded as the Last Will and Testament of said Raymond C. Kell.''

[2]This was the document in question, the purported will of decedent Kell which was denied probate.

full. It could not have been water. Heckendorn saw him pour it out of the gin bottle. The witness was at the Kell place every working day during the last six months of Kell's life, and usually saw Mr. Kell at least once during each working day. The witness said that Kell was always drinking, or in a more or less drunken state.

Joseph Kahey said he visited Kell's bar practically every day after work through part of 1956 and in 1957 until after Kell's death. Practically every day Kell was drinking. Some days he could make it pretty good and others he couldn't. He drank beer almost every day and then he would drink a few shots of whiskey. His physical appearance was affected by this drinking. Practically the biggest part of the time he was under the influence of liquor. He got considerably worse during the last two months of his life. Kahey had seen him drink gin or vodka. He would pour a pretty good shot of it, straight. Occasionally he would mix it with quinine water. Kahey had seen him drink a water glass half full of vodka, occasionally more than half-full. There were times when he was so drunk he couldn't make change. When drinking that vodka he would not have been able to make 65 cents change out of $5.00. There were times when he was not coherent in his speech and could not follow a train of thought. Kahey had seen him fall down right in the bar, stumble and fall down. He was drinking at that time. He was kind of hard to hold a conversation with. He would kind of wander off occasionally.

About two weeks after the signing of the purported will, George Britton, an old acquaintance of Kell, dropped in to see him. A long conversation ensued. Britton said that Kell "was pretty well liquored up and . . . very despondent . . . and wanted to tell me his troubles, and he had plenty of them . . . and that he had to make a will . . . and he told me that he just about had reached the stage where he was going to end it all; he was going to blow his top . . . and then he told me that his daughter Anita, had moved out on him, and that he had found out that she was going south with some of his money . . . ." (There was evidence that the daughter did not have access to his money and could not have taken any of it.) Asked if Kell said he had already made a will, Britton replied, "No, no, he made no mention of making a will. He said he had to make a will, and he wanted advice from me on how to make it." Asked if Kell had said he had gotten any help from anyone in making a will, Britton said, "No, he never mentioned having made a will or getting help in making

a will. He had to make a will, that was his big problem, but he repeatedly said he was going to do away with himself''; also, that "he repeated his conversation many times. We probably sat there in the car about an hour, discussing this''; and that making a will "seemed to be foremost on his mind, that he just had to do that . . . and he kept repeating himself on that." He did not say what he was going to put in the will, ". . . that was one of the things that bothered him . . . his daughter and . . . [he] had parted company and his wife and he had parted company and he didn't know what to do." He wanted advice and at the end of their conversation he said, " 'This is such a mess, I should will it to you and let you clean up the mess.' "

In response to questions asked by the court, Britton said that Kell did not indicate in any way to whom he wished to leave his property; during the whole conversation he did not indicate whether he wanted to leave all of it to his wife or all to his daughter, or either one; he ended up by saying that he thought he would leave everything to Britton and let him straighten out the mess.

About 10 days later Kell committed suicide.

There was other evidence, much of it of an opposite import, but that which we have summarized is sufficient. From it, the trial court could reasonably infer that the decedent suffered mental deterioration in increasing degree from long-continued excessive use of intoxicating liquor; was in a drunken stupor at the time the witnesses signed the document; had been laboring under an insane delusion that his daughter was stealing his money; and two weeks later had no recollection of having made a will. These inferences, coupled with his lack of any idea, two weeks later, what disposition to make of his property, followed by suicide in another 10 days, furnish adequate support for the finding that he was not of sound mind at the time of execution of the purported will.

In view of this conclusion, it becomes unnecessary to determine the sufficiency of the evidence to support the findings of undue influence and lack of testamentary intent. Nor do we see such an inconsistency between the three sets of findings as would disallow the finding of unsound mind; quite the contrary might be the case.

The judgment is affirmed.

Bray, P. J., and Tobriner, J., concurred.